Good afternoon, Your Honors. My name is Matt Miller. I'm arguing on behalf of the appellants in this case. Now, to begin, I'd like to frame this case by walking through the events that got us to where we are. On April 4, 2022, the General Counsel for the National Labor Memorandum, in which she said that she believes that if an employer holds a mandatory meeting where statutory labor rights are discussed, that meeting is per se unlawful. Three days later, she issued a press release announcing the memorandum. She tweeted about the memorandum, and four days after that, she amended a brief in the CMEX construction case to adopt the arguments, announcing that those rules are per se unlawful. Now, the only reason I can think of for somebody to do this publicly, to issue a press release, to tweet about it, to make the text of the memorandum public, is to encourage employers across the country to immediately begin changing their behavior. Thousands of employers, to my knowledge, did so. There were news articles about this, and the appellants in this case, which are five Texas staffing companies that between them have thousands of employees in dozens of different industries, were concerned enough that they filed this immediate complaint in the district court. They showed Article III jurisdiction of that court under this court's precedent in both Contender Farms and Texas Medical Association, which was the subject of a 28-J letter that we submitted previously. In Texas Medical Association, this court said that the fact that a plaintiff is subject to regulations that are contrary to law is itself a concrete injury sufficient to give them standing. No one disputes in this case that these plaintiffs, or these appellants, are subject to this new rule. Their employers are subject to Section 7, they're subject to the jurisdiction of the General Counsel, and . . . The NLRB will ultimately decide whether or not this rule is lawful, but Your Honor, I want to make clear, the actions of the General Counsel in her executive capacity are what caused the chilling of speech in this case, and it is those actions that we're challenging. You're not self-enforcing. It's what she is going to do. Persuade the NLRBD, if she can. If she can. Is that correct? That's correct. If she can persuade the Board, they'll adopt her rule. But . . . So you just don't want to know we're talking about it. In other words, I don't see an enforceable order here that puts you in the position of getting standing to challenge a government official who's just like a prosecutor, and he is a prosecutor, that I'm going to argue this to the agency that will probably get the rule. Yes, Your Honor. Well, that is often the case in chilling cases. You have a prosecutor who has announced that they're going to begin doing something, and then you have plaintiffs who change their behavior as a result of that announcement. That's because they have the power to do it. Now, the problem is, what do they do? Do they charge him? No. She has to persuade an independent agency creature of the Congress who has the authority to do this. That's the difficulty I have with standing here. Sure. Thank you, Your Honor, for the chance to address that. So let me be clear. The General Counsel is a completely separate authority from the Board. Congress amended the National Labor Relations Act in 1947. To make that clear, the Supreme Court has made that clear. And it is not the eventual ruling of the Board that we're challenging in this case. It is the instant executive actions of the General Counsel. That's often the case with chilling. The relevant standard under the Carmuch case out of this circuit is whether a person of ordinary firmness would censor themselves as a result of that executive action. The General Counsel went out of her way to make this public. She went out of her way to tweet about it. The only reason I can think of why someone would do that is to change behavior today, is to tell employers, you need to stop holding these meetings today. Okay, but that's true of a lot of people. If I walked out here and I said, lawyers need to do X, Y, Z to be ethical, hopefully that would influence people, but that wouldn't mean you could sue me. But if you threaten to enforce a rule in an unconstitutional way, as an executive agent, which the General Counsel is, I can sue you, because you are preventing me from exercising a constitutional right, namely the right to engage in these meetings. Okay, well let's talk about, so I wrote the en banc opinion in Cochran, which was affirmed by the Axon case. It was combined with Axon. Y'all didn't note that in your briefing, both sides, but it was part of the Axon case. But the importance of those cases, Axon was reversed, Cochran was affirmed, is it was challenging the agency's constitutionality. And these were people already being prosecuted by an agency. So that was a different animal than we have here. If y'all were being prosecuted by Abbruzzo, is that how you pronounce it? Then that might be a little different cubby. But isn't this just, y'all don't like the thought that she might come after you? Well, none of us want somebody to come after us, but that doesn't mean we can file a lawsuit. So the Axon case, it certainly demonstrates that if you're being prosecuted under an unconstitutional scheme that would violate the structure of the constitution, you would have standing to bring that case. But a chilling claim is axiomatically a pre-enforcement claim. If we were being prosecuted, then we would be raising a censorship defense to the prosecution. What courts say over and over in chilling cases, the speech first case out of this circuit is a great example, is that if a person of ordinary firmness would self-censor as a result of the action, that's chilling. And that decision to self-censor is a constitutional harm. That's what we alleged in this case. The complaint walks through it. And this court at this stage is required to take that complaint as true. Now, the district court made four errors when it dismissed this case. The first, and this goes to Axon to some extent, was that it said that these claims are precluded by the National Labor Relations Act. And again, the chilling is important here. Under Thunder Basin, there are three factors we look at to determine whether or not there's been preclusion. The first of those is the most important. It says, would preclusion foreclose all meaningful judicial review? It would have to. Logically, it would have to. If I can't bring a chilling claim in district court, then I can never bring a chilling claim. The NLRB itself has no authority to hear that chilling claim. There would be no vehicle by which I could bring it. If I was under active prosecution, at that point it would just be censorship. The second factor is whether the claim is wholly collateral to the statute's review process. Again, here it is. I'm not trying to bring a claim that I could bring before the NLRB. I'm not attacking an ongoing NLRB proceeding. I'm bringing a claim that I could bring before the NLRB. That's correct, Your Honor, but the employees maintain or remain under the final control of the staffing company. These are not people who help people get jobs. They have thousands of employees themselves. Under the third Thunder Basin factor, the question is whether the claim is outside of the agency's area of expertise. Now, I would say that while the NLRB might have some expertise in the First Amendment, that Article III courts have the most expertise in the First Amendment, and that they're the proper venue to hear this chilling claim. The second error that is made by the district court is saying that this was not final agency action, and there we can look at Bennett v. Speer and see that it was. Under Bennett, the first question is, does the action mark the consummation of the agency's decision-making process? Now, there's been a lot of confusion in this case about the general counsel, about the board, about who's the final decider. For purposes of this executive action, the answer to that is the general counsel. Congress made that clear in 1947, and the Supreme Court has also made that clear in NLRB v. United Foods. The general counsel is appointed by the President and confirmed by the Senate, and she is specifically not subject to review by the board, so the board would have no way to prevent these prosecutions except by saying, we're not going to adopt these rules. But that doesn't change the fact that she would be out there prosecuting employers. But if she prosecuted and they disagreed, then they'd throw it out. They could throw it out. So then isn't that the key? I mean, the fact is that you can always have some prosecutor who's running around prosecuting something that's not even a crime and whatever, and that's horrible, but ultimately gets thrown out. So isn't that your ultimate concern of your clients is they don't want to be convicted, but she can't convict them? No, Your Honor, the concern is twofold. Yes, they don't want to be convicted, but they also don't want to be drug into these proceedings unconstitutionally. It's like the old saying, you can beat the rat, but you can't beat the ride. The ride is provided by the general counsel, and having to retain counsel, having to go through the proceedings, having to appeal that. Yeah, but if we were sitting around having to rule about general counsels before they even filed anything against someone, then the huge amount of work we already have, I would never get to sleep. Well, that would be regrettable, Your Honor. I mean, you can't. Yeah, I understand that people want to just live their life and not have X and Y and so on, but the notion that someday you might get X and Y, why is that enough to be able to sue, particularly if X and Y is going to ultimately lose? So the relevant standard is the person of ordinary firmness standard. Would you hear her say this? Would you hear her announce it? Would you change your behavior as a result of that? Corporate counsel around the country has written memoranda, they've written articles on websites encouraging companies to change their behavior simply as a result of this announcement. Now, you and I might disagree about what a person of ordinary firmness would do, but I believe, and I think the correct answer is that a person of ordinary firmness would self-censor as a result of this rule, and therefore the Chilling Test is satisfied under Speech First, under Susan B. Anthony, and under a House of Representatives. But, I mean, why can't she try to convince people to do something she wants them to do? If she's ultimately found wrong, okay, by the NRLD, but why, I mean, even if you all have the right to do this, but she thinks it's horrible, why can't she say that? It's one thing to say it in a brief, you know, we didn't go digging through her briefs trying to find this argument. This argument was raised publicly in a press release. Why have the press release? Why tweet about it? Unless you're trying to convince people to change their behavior today. Otherwise, run your cases, get a decision out of the board, and then say, hey, the board has decided this, and now you guys need to change your behavior. She was trying to bully these companies into changing their behavior now, and that is what causes the chilling in this case. Does she have First Amendment rights? I'm sorry, Your Honor. Does she have First Amendment rights to speak out about what she's concerned about? Well, she would, but when she speaks in her official capacity, she's speaking on behalf of the government, and that speech is an executive action, and that executive action carries with it, you know, a threat that employers can be prosecuted, and that's what causes these employers to change their behavior in this case. The second factor of Bennett is addressed by this Court's decision in Texas v. EEOC. What this Court said, and again, this was enforcement guidance in Texas v. EEOC, that's what it was called, just like this, that an agency's guidance documents binding it and its staff to a legal position produce legal consequences or determine rights and obligations, thus meeting the second prong of Bennett. The district court erred when it decided that this was not final agency action. I see that my time is limited. I'll talk briefly about the other two errors. The first was that they said this was prosecutorial discretion. Again, prosecutorial discretion has to do with an individual case, individual charges, and an individual client. This is a new rule. She wants a change in practice that has existed for 75 years that applies nationwide to thousands of employers. This is not what we mean when we talk about prosecutorial discretion. And then finally, the district court said that the appellants in this case did not plead an injury, in fact. I think you can look at the pleadings and see that as incorrect. What the pleadings said, this is the record at 16, is that plaintiffs have discussed concerns about unionizing openly with employees. Plaintiffs would hold meetings on paid time to explain the harm of unionization, and that they have not held those meetings as a result of this rule. That satisfies all three elements of this Court's decision in speech first. We've alleged an intention to engage in the conduct. The conduct is arguably prescribed. Nobody disputes that here. There's a substantial threat of future enforcement. Ms. Abruzzo, by her own admission, as of May of 2023, was actively prosecuted in over two dozen cases under this theory. The threat of future enforcement is very real, and therefore all three prongs of chilling are satisfied. So taken on the four corners of the complaint, plaintiffs alleged a successful chilling claim. They invoked the district court's Article III jurisdiction, and nothing in this opinion defeats that jurisdiction. I see I've got about 20 seconds left. I'm happy to answer any questions the Court may have. Otherwise, I'll save my time for rebuttal. All right. Thank you, sir. You've reserved your rebuttal time. All right. Counsel. Mr. Wiese. Good afternoon, Your Honors. May it please the Court, Tyler Wiese on behalf of General Counsel Jennifer Abruzzo. At least two insurmountable obstacles lay in front of appellant's claims. First, the National Labor Relations Act provides an exclusive channel of review for board action, and that is circuit court review of a final board order under Section 10 of the Act. Court challenges to board action outside this exclusive review scheme almost universally have been found to lack jurisdiction. Second, the NORA creates a stark division between the adjudicatory duties of the agency, which are handled by the five-member board, and the prosecutorial authority of the agency, which falls within the purview of the statutorily independent General Counsel. While decisions by the board are channeled to review in the circuit courts, the General Counsel's prosecutorial authority is wholly insulated from judicial review. No court has ever enjoined the issuance of a guidance memorandum by the General Counsel, and these two well-established principles demonstrate why. Appellant's attack on the on that grounds alone, this appeal can be resolved. So what's your distinction of the Axon-slash-Cochran case? Yes, Your Honor. I think the distinction focuses on the nature of the action being challenged. In Axon, you were dealing with an attack on the structure of the agency itself. They were structural claims that didn't depend on the facts of any given case. Whereas here, what specific decision on a specific set of facts applied to a specific party. And so I think on those grounds alone, Cochran and Axon are easily distinguished from what we have going on here. I think another, touching on the other Thunder Basin factors, I think another factor that's really important in this case is the agency's expertise. And in particular, when you look at the memorandum here, the threshold issue is not whether the First Amendment is implicated by the memorandum. The threshold issue is whether, in fact, captive audience meetings violate Section 7 of the National Labor Relations Act. And only if that finding is made does the constitutional issue come into play. And that threshold issue of whether a captive audience meeting violates the National Labor Relations Act is something that is squarely within the purview of the National Labor Relations Board. And so there's a couple of cases regarding jurisdiction specific to the NLRA that I'd like to highlight here. So why did she go out in public and put this all online and all this stuff if she's just being a general counsel? I mean, most prosecutors don't run around going online saying don't murder anyone. They just go prosecute people who do. Yes, Your Honor. I think, I mean, you have to take a step back and look at captive audience meetings in general. It's been the law under the National Labor Relations Act since, I believe, 1950 that captive audience meetings have been lawful. And it's a common tactic that employers have used when facing union campaigns to hold captive audience meetings. And so by publicly announcing the theory in a memorandum that, by the way, is directed to the agency's staff, not the public at large, she's advising the regulated community as well as the agency itself that this is the theory that she intends to pursue going forward. I do think prosecutors should not want people to murder, so I'm not criticizing it when they do go out and say that. I'm just saying that prosecutors generally, in crimes, go and prosecute them, and that's their job. And I just don't, I mean, I'm not agreeing or disagreeing with her thinking on this, but like I said, your opponent is mad that she went online and was like screaming this out to the world rather than simply prosecuting Mr. X and Mrs. Y. Well, Your Honor, I don't think the memorandum really has any practical effect in that sense, because if the dozens of complaints that appellants have spoken about charging captive audience meetings, those are public knowledge as well. And so once those complaints get out into the open, it's going to be advertised, at least within the labor bar, that the general counsel is going after captive audience meetings as a legal theory to present to the board and hopefully get the board to overturn its precedent in a final order. So I don't think the memorandum actually has much, if any, of a broader effect than the issuance of complaints in individual cases would, particularly given the scope of the captive audience meeting issue. But isn't she trying to chill them? No, I don't believe so, Your Honor. I think what she is trying to do is she is trying to get the board to change its position and hold that captive audience meetings are in fact unlawful. But if you look at the text in the memorandum itself, it's phrased in aspirational terms. What it talks about is her intent in appropriate cases to urge the board to change its precedent on captive audience meetings. There's nothing about trying to change the employer's behavior directly. The intent of the memorandum on its face is directed towards the board to change its precedent. And I'd also like to point out that the memorandum is by no means a final agency order under the APA. As the Supreme Court held in UFCW Local 23, there's two exemptions under the APA, specifically 5 U.S.C. 701. One says that agency actions are unreviewable where the statute precludes review. And the Supreme Court specifically held in UFCW that the general counsel's prosecutorial authority falls within that exemption. And so the APA claims that appellants are relying on are explicitly excluded by UFCW. As to the other points on subject matter jurisdiction, I'd like to address briefly. The first is that the mere fact that appellants are bringing constitutional claims doesn't defeat the exclusive review provision under the NLRA. And that has been the law since the early 1930s, when in a case called Myers v. Bethlehem Shipbuilding, the Supreme Court and the NLRA are open to examination by the court following a final board decision. And this court and other federal courts have consistently followed those. For example, in Boca v. Tidewater, this court held that the fact that an attack is voiced in conclusive language, like constitutional rights, does not warrant stopping the board in its tracks. And so that alone isn't up to defeat appellants' claims on subject matter jurisdiction. But there's a second independent level that defeats these claims as well. And that's the fact that in a long line of cases, including the Supreme Court's decision in United Food and Commercial Workers Local 23, that have unquestionably held that the general counsel has broad and vast discretion in disguiding which cases to prosecute, and that those discretionary choices are final and unreviewable in court. And that even includes when the general counsel's actions are final. For example, a general counsel's decision to dismiss a complaint or a charge in an unfair labor practice case, that's the end of the agency proceedings. But even that decision is not reviewable in circuit courts. And here what we have is a challenge to interim agency action. The general counsel is attempting to prosecute these cases before the board, but there isn't any final agency action until the board issues an order in an unfair labor practice case. And so those two principles alone defeat jurisdiction here. I'd also like to touch briefly on appellants' claim that Larson provides jurisdiction in this case. That is also incorrect. Larson deals with defense of sovereign immunity. That's not what the NLRB is relying on here in defense of its claims. What the NLRB is relying on is that we have an exclusive statutory review scheme that governs claims under the NLRA. And the Supreme Court recently, in Armstrong v. Exceptional Child Center, recognized that the power of federal courts of equity to enjoin unlawful executive action is subject to express and implied statutory limitations. And that's precisely what the NLRA is. It's a limitation on the courts of equity to enjoin the actions of agency officials. Now, touching on standing, which is the primary basis of appellants' claims here. In fact, they didn't even address the NLRA-specific subject matter jurisdiction precedent. But the dispute between the parties here really rests on the injury in fact requirement. And in order to establish an injury in fact under the First Amendment, appellants must show three things. First, that they have an intent to engage in a course of conduct arguably affected with a constitutional interest. Second, that the intended conduct is arguably prescribed by the policy in question. And third, that the threat of enforcement of the policy is Appellants have not met any of these requirements. First of all, the intent to engage in action covered by the memorandum is not met here. If you look carefully at plaintiffs' pleadings and even their briefing in this case, all they've pled is that if they were to face a unionization drive, they would like to hold captive audience meetings in the event of that. That's not a firm intent to engage in the conduct. That's a contingent intent to engage in the conduct based off of the conduct, the further conduct of third parties that are completely outside the control of the agency and the general counsel. Second, the memorandum doesn't prescribe anything. The memorandum is merely the presentation of a legal theory internal within the agency to the board. It doesn't say that, it doesn't determine any rights or obligations. And again, I think we need to look carefully at Appellants' pleading on this conduct because Appellants' conduct, again, does not actually violate the terms of the memorandum as it's pled. What they say is that they want to hold meetings with employees on paid time. There's no indication that those meetings are going to be involuntary for employees to attend, nor is there any indication as to whether or not the employer would provide the assurances that are provided for in the general counsel's memorandum. And then the third element, the substantial threat of enforcement. Appellants are correct in recognizing that when you're dealing with pre-enforcement challenges to recently enacted statutes, courts will generally assume a credible threat of prosecution. Nonetheless, even under this lessened standard, there's no substantial threat of enforcement here. First, as the lower court recognized, we aren't dealing with a statute or even a regulation. It's merely a memorandum seeking to change existing law. Second, the memorandum does not facially restrict anything. Only the board has the power to actually restrict behavior. And third, the allegations of chill that plaintiffs rely on must have an objective basis. And this court in Texas State LULAC in Glass v. Paxton outlined what's required to have an objective basis for chill. And that specifically, an objective basis of chill is lacking where a chain of contingencies exist between challenge policies and enforcement. And specifically in Glass, this court held that in considering the chain of contingencies, you must identify, one, each link in that chain, and second, establish that each link in the chain must be certainly impending to confer standing. Now, here, the chain of contingencies is not only long, but none of the events are certainly impending. First, as I've already discussed, the decision to hold the captive audience meeting is contingent on a union campaign, which has not occurred at any of appellants' facilities. Second, appellants would have to engage in conduct violative of the memorandum, something they have not pled. Third, a party would have to file an objective audience memorandum. The board doesn't have independent prosecutorial authority. The only way it can act in a case is if an independent party files a charge. Fourth, the regional director would have to find that it was an appropriate case in which to issue a complaint. Now, I'd like to highlight the fact, as we stated in our briefing, that the general counsel's policy throughout her time as the chief prosecutor for the agency has been only to issue complaints in cases alleging a new theory of a violation under the NLRA where there's other existing violations. And so if all appellants were to do in this case is hold a captive audience meeting under the terms of the memorandum and not provide the assurances, they wouldn't be subject to an unfair labor practice complaint because they would need to have committed other conduct violating the NLRA under established law. And then fifth, the general counsel would have to establish at trial evidence of a mandatory captive audience meeting. That's not a meaningless step. Will she remain the general counsel with a new president? I'm not sure of that, Your Honor, frankly. Because regardless of who is going to be elected, the current president has chosen not to run, so it's going to be a new person. It could be a new person. The president could presumably re-nominate Mr. Brousseau. Right, but he or she doesn't have to, right? No, correct, correct, Your Honor. And in fact, I would point out that as opposed to board members, the general counsel is much more politically accountable to the president. Mr. Brousseau's predecessor, General Counsel Robb, was fired during President Biden's first day in office, and this court held that that removal of General Counsel Robb was lawful in Accela Enterprise Solutions. That's another, I think, maybe somewhat relevant to the issues here that we do have a politically . . . Does the timing matter? The timing of what? Of anything, because there's some chance she'll be gone in a few months. Yes, Your Honor, and that . . . And again, I'm not saying she should be. I'm not saying he'd be elected, whatever. I just know that we're going to have a different president. That's my understanding anyway. Yes, and I think that ties into a good point, and I'm glad that you asked that question, which is that the memorandum is not . . . There's nothing to stop the general counsel from tomorrow deciding that she wants to rescind the memorandum. All she'd have to do is announce it. It's not like a regulation or a final board decision where some sort of formal action has to happen in order to rescind the memo. All she would have to do is wake up tomorrow and say, Okay, I don't want to prosecute these captive audience cases anymore, and that issue would go away. And I think another point that I'd like to touch on, which was not addressed specifically by the lower court, but I think is important to point out, and that is the issue of ripeness. And in order specifically for an issue to be ripe, there's two considerations. First is the fitness of the issues for judicial decision, and the second is the hardship to the parties of withholding court consideration. And in particular, this is not an issue that's fit for judicial decision. As this court held in Energy Transfer Partners v. FERC, one of the things that you look at in ripeness is whether you have final agency action under the APA. We don't have final agency action here. All we have is the interim presentation of a legal theory to the board who will then engage in final agency action. And so on those grounds, this case is not ripe. And I think at the end of the day, there is a simple and straightforward way to decide this case, and that is to rely on the well-established jurisdictional doctrines under the NLRA that I outlined at the beginning of my remarks. Congress has established a comprehensive review scheme under the NLRA for deciding whether particular conduct, including speech, violates the NLRA. That review scheme channels all NLRA claims through the National Labor Relations Board with circuit court review as a backstop for parties to ensure their rights are not violated by the agency. As the Supreme Court held over 80 years ago in Myers, this review scheme encompasses situations where parties raise constitutional claims. And that conclusion is only bolstered here because appellants are challenging the general counsel's authority to issue complaints, which has been held to be unreviewable by the Supreme Court in UFCW and this court in a decision called Winn-Dixie v. NLRB, which was not cited specifically in our briefs, but I do have the citation here. That's 567 Federal 2nd, 1393. This precedent applies with dispositive force to appellants' claims today and is sufficient to deny subject matter jurisdiction here. The court need go no further. And with the brief amount of time that I have left, I'd just like to touch on the practical impacts that could occur if the court finds that there's subject matter jurisdiction in this case. The board deals with speech issues by employers and unions on a daily basis. Whether or not something is an unlawful threat during a union campaign, for example, as I was thinking about this, one of the statements that often comes up in union campaigns is employers telling employees that you have to start from a blank slate if you have a union represent you. And the board at times has held that that's unlawful. At other times, it's held that it's not. But if you agree with appellant's position that there's subject matter jurisdiction any time a First Amendment issue is raised, those cases can go directly to court, to district court, and then ultimately to this court, without giving the board an opportunity to weigh in on it. And that completely defeats the exclusive review scheme under the National Labor Relations Board and obviously would have huge practical effects on the workload of every district court in the country. If the court has no further questions, I would ask that they affirm the decision of the lower court. All right. Thank you, counsel. Mr. Miller, you have the right of rebuttal. Thank you, Your Honors. I have a few points on rebuttal. The first, and I think this is the most important, is, again, to understand what we're dealing with here. This is a chilling case. My opposing counsel said that the board, you know, can't address all First Amendment issues. The board can't address chilling. If this court is to rule that these plaintiffs don't have standing in this case and that the National Labor Relations Act provides the exclusive vehicle to bring claims against the board, then no plaintiff will ever be able to bring a chilling claim against this board. It is axiomatically pre-enforcement. And if they believe we could bring this chilling claim, I would challenge opposing counsel to explain how. What vehicle did these plaintiffs have to bring this claim except to go and raise it in district court? That's what they did. It was appropriate. And the district court improperly denied that claim. Second, and relatedly, I'd like to briefly touch on the timing problem here. So under their theory, she says she's going to do this. She makes it public. She begins doing it in dozens of different cases. We would have to wait until we are actively subject to a complaint and subject to prosecution. And then what? Run into the district court and try to get a TRO to allow us to hold the meeting? That's not practical. That's not realistic. That's why we allow chilling claims to be brought before someone is actually . . . Yes, Your Honor. There's another way to view this, and that is that you're not caught by surprise. She intends to pursue that, make this argument, try to persuade it. There are advantages to Barr and others to know that this is in play and to mitigate cautionary action, which I'm sure you're doing. So it's not all . . . On the one hand, it's a threat and kind of intimidating to argue. But on the other hand, it can be seen as a heads-up, guys, out there. This is the position I'm going to push. And you don't have to lie to it. At least you know what's coming. There is a value in notice. Well, if the value is that you can change your behavior before you're prosecuted, I would agree with that. But a lot of the rulemaking that's out there requires a notice in advance, too. Yes, Your Honor. And I want to make clear . . . It touches on something the opposing counsel said. He said that if we're correct and this case goes forward, then any First Amendment claim could just be brought as an instant matter in district court. That's not what we're arguing. We're saying Chilling claims can, because they can't be addressed by the NLRB. That Chilling itself is the constitutional harm, as this Court and the Supreme Court have repeatedly held. Opposing counsel briefly touched on this secondary complaint issue, saying that, oh, we're not going to bring these unless there's also another illegal action that's alleged. That's not in the memo. That's nowhere except in some comments that Mr. Brizzo made on a panel before the American Bar Association. And they certainly haven't revised the memo or done anything to explain to employers that that's the policy. Fourth, the opposing counsel raised ripeness. Contender Farms was also a ripeness case. And they found that the claims were ripe in Contender Farms if the plaintiffs or objects are the object of the restrictions, which we are here, and if they're subject to an increased regulatory burden, which we allege in the complaint in the form of Chilling. And finally, Your Honor, opposing counsel relies on Bocat and Bethlehem Steel. I'll just point out those both involved collateral attacks on ongoing actions, which this case is not. This is not a collateral attack on an ongoing case, and it's distinguishable from Bocat and Bethlehem on that basis. I've got a little more time. I'm happy to answer questions. Otherwise, we respectfully ask that the district court be reversed on the 12B1 motion to dismiss, and this case be remanded for proceedings on the merits. And I thank you for your time today. All right. Thank you, counsel, on both sides, for your briefing and argument in the case. The case will be submitted, and we will get it decided. Thank you. You may be excused.